870 So.2d 927 (2004)
Mark Vincent OLVERA, Appellant,
v.
STATE of Florida, Appellee.
No. 5D03-3803.
District Court of Appeal of Florida, Fifth District.
April 23, 2004.
Jerri A. Blair and Jerry T. Lockett, of Lockett & Blair, P.A., and Michael A. Graves, of Graves & Spivey, P.A., Tavares, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Carmen F. Corrente, Assistant Attorney General, Daytona Beach, for Appellee.
GRIFFIN, J.
Mark Vincent Olvera ["Olvera"] appeals the summary denial of his second rule 3.853 "Motion for DNA Evidence Examination." We affirm.
*928 In June 1989, an eighteen year old girl named Tina Hendricks was sexually battered and then murdered by strangulation, and her body was thrown into a canal in a Lake County park. Evidence accumulated by law enforcement authorities revealed that, on the night of the murder, the victim was in a bar dancing and drinking into the early hours of the morning. Olvera was also in the bar and witnesses testified that he attempted to dance and talk with the victim. Certain eyewitness testimony also indicated that the victim left the bar with Olvera. Forensic evidence indicated that the semen retrieved from the victim's vagina matched the DNA provided by Olvera's blood samples, and hairs found in the car he was driving that night were indistinguishable from the victim's. The hair was not DNA tested, however.
Olvera was charged in the death of Tina Hendricks and the jury found him guilty of first-degree murder[1] and sexual battery.[2] The trial court sentenced him to a term of life imprisonment, with a mandatory term of twenty-five years on the murder conviction and a consecutive life sentence on the sexual battery conviction.
Before trial, DNA testing was done on at least four individuals: Olvera (who is Hispanic); Tom Hopwood, the victim's boyfriend; "Johnny" Lockerd, an individual who was also at the bar that night and who some witnesses identified as being the individual who left with the victim; and a fourth individual, Ken Bowles, a friend of Olvera's.
At trial, the State introduced evidence concerning the DNA testing performed in this case through the expert testimony of FBI DNA analyst, Audrey Lynch ["Lynch"]. The State properly qualified Lynch as an expert in the field of forensic DNA profiling without objection. Lynch testified that in every case she is involved with, she will have four autoradiographs prepared, each corresponding to a different location on the sample's DNA and each isolated by a different probe. The four probes used on each of the K1 through K4 samples and on the Q1/Q2 sample are known as D2S44, D17S79, D157 and D4S139. Lynch testified that the D4S139 probe introduced a defective autoradiograph, and that it was not used in her statistical calculations in this case. S he also testified that the Q1/Q2 sample, as is usual in the circumstances, included DNA from both the victim's vaginal cells and from the semen in her vagina; Lynch testified that the mixed Q1/Q2 sample in this case was successfully separated into two DNA strands, one of which she could identify as matching the victim's known blood sample.
Lynch testified that the FBI's DNA tests showed a match between the male DNA found in the victim's vagina and Olvera's, meaning that Olvera had sexual relations with the victim before she was murdered. Lynch testified that the K2 sample, taken from Olvera, appeared from a visual examination of each of the three usable autoradiographs to match the male strand of the Q1/Q2 sample. She testified that she confirmed those preliminary visual matches with a computer program that converts the visible bands on the autoradiographs to a digital measurement. According to Lynch, the DNA testing indicated the probability that an Hispanic person other than Olvera had sexually assaulted the victim on the night of the murder was 1:290,000.
Lynch explained how the FBI determined the probability that another Hispanic person has the same DNA profile as that of the male contributor to Q1/Q2. *929 Each of the three probes used illustrated two measurable DNA fragments. The FBI consulted its database of Hispanic blood donors and determined from that database the rarity of each of the six visible fragments. According to Lynch's testimony, the two bands on the D2S44 probe appear respectively in 12.3% and 5.4% of the Hispanic population; the two bands on the D17S79 probe appear respectively in 4.4% and 17.5% of the Hispanic population; and the two bands on the D1S7 probe appear respectively in 6.5% and 9.8% of the Hispanic population. The six probabilities multiplied together by the "product rule" produced the 1:290,000 figure.
Lynch also testified that she concluded absolutely, based on each of the three successful autoradiographs, that Kenneth Bowles' and Tom Hopwood's samples did not match the male strand of the Q1/Q2 sample. Finally, Lynch testified that she was subsequently sent John Lockard's blood sample and through additional testing, excluded Mr. Lockard.
The State called Dr. Arthur Eisenberg ["Dr. Eisenberg"] as an additional expert witness. He testified that he had been asked to test the Olvera K1 through K4 samples, solely in order to determine whether the samples could have been switched with someone else's in the FBI lab, a theory put forth by Olvera. Dr. Eisenberg testified that the K3 and K4 samples were too decayed to test by the time he received them, but that he tested K1 and K2. Dr. Eisenberg testified that the results he obtained using the D2S44 probe were respectively .4%, 1.3% and 1.1% different from the FBI's results and that the results he obtained using the D17S79 probe were respectively .4% and.2% different from the FBI's results. His conclusion was that there was no sample switch.
Dr. Ronald Acton ["Dr. Acton"] testified as an expert witness for the defense. He opined that the H2 Hispanic database used by the FBI does not include enough information for him to determine if the sample could be said to fairly represent a Hispanic population. Dr. Acton concluded that the H2 database is not adequate to support the FBI's probability figure.
Dr. Acton further testified that, based on his own review of the FBI autoradiographs of the K2 sample and the Q1/Q2 sample, the two did indeed appear to match. He also testified that he was provided in discovery with only two autoradiographs made from the K6 (John Lockard) sample, and both were exposures made from the D2S44 probes. Using the FBI's match criteria, he could not rule out John Lockard as the contributor of the male Q1/Q2 sample.
George Duncan ["Duncan"] testified as a rebuttal witness for the State. He testified that in his work analyzing DNA profiles for the Broward County Sheriff's Office Crime Laboratory, he routinely determines if two samples match by visually comparing them, then by confirming any match with a computer imaging process, then by confirming the computer's results with a ruler. Duncan testified that he had compared the single K6 (John Lockard) autoradiograph, prepared from probe D2S44, with the corresponding D2S44 autoradiograph prepared for the Q1/Q2 sample, both visually and with a ruler, although he had not had a chance to do any computer imaging analysis. His conclusion was that K6 did not match Q1/Q2.
After his conviction, Olvera appealed. On May 31, 1994, this court affirmed Olvera's judgment and sentence. Two years later, he filed a 3.850 post-conviction motion. It was subsequently denied, and this court affirmed.
*930 In 2002, Olvera filed a petition for post-sentencing DNA testing pursuant to Florida Rule of Criminal Procedure 3.853. The motion requested re-testing based in part on the "switched samples" theory espoused at trial. The motion also argued that the previous DNA testing was inconclusive because there was an absence of DNA residue of Hopwood in the vaginal sample. Hopwood had testified to having intercourse with the victim the morning of the murder. The court denied Olvera's 3.853 motion, and this court affirmed.
In 2003, Olvera filed a second motion for DNA testing. This time Olvera took a different approach. He urged that the evidence at trial overall was weak and that evidence pointed equally strongly to other possible perpetrators. He asked that the hair samples found in his car, which had not been DNA tested, be subjected to such testing, and he sought a retest of the blood samples on the ground that two of the samples had been found to be decayed by Dr. Eisenberg and because the probability figures relied on by Lynch were not reliable.
We pretermit for now the argument made by the State that a convicted person may not file more than one rule 3.853 motion for DNA testing, although we are inclined to agree with the State. Certainly, this case offers no good reason to allow successive motions. There is no argument made that the relief sought in the second motion and the arguments on which it is based could not have been asserted at the time of the first motion. Olvera's argument basically is that because successive motions are not expressly prohibited, they must be permitted. Applying the reasoning of the Florida supreme court in State v. McBride, 848 So.2d 287 (Fla.2003), we think the high court would not allow successive rule 3.853 motions except pursuant to rule 3.853(d)(1)(B).
Olvera's position is further weakened by the fact that, unlike others seeking DNA testing who were convicted without the corroboration of DNA testing, Olvera's trial was centered on DNA evidence. Although Olvera focuses on the lack of testing of the hair samples, the trial court explained, in denying the second motion, that no matter what the outcome of any test of the hair samples, the fact remains that DNA testing has shown that his semen was found in the victim's vagina. In order to avoid this impediment, Olvera is forced in 2003 to seek again what he did not succeed in obtaining in 2002a re-evaluation of the vaginal swab. Even if procedurally he were allowed to do this, the grounds he puts forth for more testing of the vaginal swab do not persuade. Although K3 and K4 may have been degraded when Dr. Eisenberg examined them, all three experts testified that they found the K2 sample matched the DNA found in the vaginal swab. The trial court did not err in denying Olvera's second motion.
AFFIRMED.
SAWAYA, C.J., and PALMER, J., concur.
NOTES
[1] § 782.04, Fla. Stat. (1991).
[2] § 794.011, Fla. Stat. (1991).